**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**STEPHANIE SOLIS,**

      **Plaintiff,**

  **v.**                        **Civil Action 2:23-cv-1390**

                                      **Magistrate Judge Kimberly A. Jolson**

**THE OHIO STATE UNIVERSITY**
**WEXNER MEDICAL CENTER,**

      **Defendant,**

## OPINION AND ORDER

This matter, in which the parties have consented to the Magistrate Judge's jurisdiction (Doc. 10), is before the Court on Defendant's Motion for Summary Judgment (Doc. 25).  For the following reasons, the Motion is **GRANTED**.  The Court further **DENIES** Plaintiff's Motion for Leave to File a Sur-Reply (Doc. 31).  The Clerk is **DIRECTED** to enter judgment in favor of Defendant.

## I.    BACKGROUND

Plaintiff Stephanie Solis has worked for Defendant The Ohio State University ("OSU") Wexner Medical Center for over a decade.  She claims, however, that she was denied recent promotions because she is African American.  (Doc. 1 at ¶ 7).

Her career with Defendant began in September 2011, when she was hired on an interim basis as an Internal Resource Pool Nurse.  (Doc. 24 at 20; Doc. 24-1).  The following year, she became a fulltime Staff Nurse and was assigned to Wexner Medical Center's Ross Heart Hospital on the fifth-floor unit ("5 Ross").  (Doc. 24 at 20–21, 33; Doc. 24-2).  The 5 Ross unit is a "vascular, thoracic, and cardiac surgery 'stepdown' unit" for patients "transitioning out of intensive care who

require more care and attention than patients on a facility's general floors." (Doc. 25-1 at ¶ 4). As a Staff Nurse on 5 Ross, Plaintiff provides care to pre- and post-operative patients, assists in developing care plans, coordinates referrals, and supervises unlicensed personnel. (Doc. 24-35 at 3 (Plaintiff's resumé)). Since 2011, Plaintiff has remained at 5 Ross, though she regularly works in other units when required. (Doc. 24 at 33).

When she was first hired, Plaintiff held a practical nursing certificate and an Associate of Applied Science in nursing. (Doc. 24 at 14). She then earned a Bachelor of Science in nursing in 2012, a Master of Science in nursing in 2016, and certification as a Family Nurse by the American Academy of Nurse Practitioners. (Doc. 24 at 14–15, 27–28). In late 2019 or early 2020, hiring manager Ajwad Farah advised Plaintiff that she should also gain experience in acute care and earn an acute care certification if she wanted to advance as an Acute Care Nurse Practitioner. (Doc. 19 at 11–12; Doc. 19-1 at 1, ¶ 6). According to the record, Plaintiff did neither before applying for the relevant jobs. (Doc. 24 at 87–88; *see also* Doc. 19 at 19 ("Nursing is not nurse practitioner. They are different professions."); Doc. 19-1 at 2, ¶ 9 ("Ms. Solis has not utilized . . . skills as a Nurse Practitioner, and she does not hold an Acute or Adult Care Certification.")).

Over the years, Plaintiff has applied for 89 Advanced Practice Provider ("APP") positions with OSU, 39 of which were posted between January 2021 and August 2022. (Doc. 24-6; Doc. 27 at 3). She was interviewed for five of these positions but ultimately was not chosen. (Doc. 24 at 6; Doc. 27 at 3). Two positions matter here: 1) APP in Ross Heart, JRN R26560 ("APP Ross Heart") and 2) APP in Vascular Surgery, JRN R46367 ("APP Vascular Surgery"). (Doc. 1 at 5–6).

Plaintiff applied for APP Ross Heart on September 15, 2021. (Doc. 24-6). The candidate who filled APP Ross Heart was to serve on a team that managed "LVAD" heart pumps. (Doc. 25

2

at 9, citing Doc. 19 at 16).  "LVAD is an acronym for 'left ventricular assist device.'  These pumps are placed inside of a patient's chest to pump blood out of the bottom portion of the heart and into the rest of the body."  (*Id.*).  Forty-four people applied for the position, and 21 candidates were selected for and participated in interviews, including Plaintiff.  (Doc. 24-29 at 2; Doc. 19 at 29).  As part of the interview process, Plaintiff spoke with a nine-employee interview panel who provided feedback to the hiring manager, Farah.  (Doc. 19 at 29–30; Doc. 20-1 at 9).  None of the interviewers on the panel were African American, although Farah does not identify as Caucasian. (Doc. 19-1 at 3; Doc. 20 at 12–14).

Farah compiled some of the employee interviewers' feedback into a spreadsheet.  (Doc. 19 at 29–30; Doc. 20-1 at 9).  The spreadsheet consisted of notes about the candidates' interactions with the interviewers, positive or negative feedback, and whether the interviewers recommended the candidate to move on to the next interviewing round.  (Doc. 20-1 at 9).  Farah testified that the spreadsheet did not include all the interviewers' feedback because he did not get feedback from one interviewer, and he did not input all of the feedback he received.  (*See* Doc. 20 at 10–11, 35–36; Doc. 20-1 at 9).  For his part, Farah said his "poor documentation" was because he created the spreadsheet "intermittent[ly]" in between caring for patients and managing his employees.  (*Id.*). The spreadsheet shows that at least one of the employee interviewers noted that Plaintiff lacked APP experience.  (Doc. 20-1 at 9).  Only two interviewers recommended that she move on to the second round of interviews, and more interviewers than not recommended she not move on to the next round.  (*Id.*; *see* Doc. 20 at 36 (Farah's testimony that he asked all nine interviewers whether Plaintiff should move forward).  Ultimately, Farah did not select Plaintiff to proceed in the process. (*Id.*).

Daniel Wade, who self-identifies as Caucasian, was selected to fill APP Ross Heart. (Doc. 25-1 at ¶ 6; Doc. 1 at ¶¶ 27–30). At the time he was hired, he held a Primary Care Nurse Practitioner certification and had recently graduated with a Master of Science in nursing. (Doc. 24-30). Wade also worked for four years as a staff nurse in Ross' Cardiovascular Intensive Care unit on the fourth-floor unit ("4 Ross"). (*Id.*). Working in the 4 Ross unit, Wade gained experience caring for patients who were post-cardiac surgery with LVAD heart pumps. (Doc. 19-1 at ¶ 14).

Turning to the other relevant position, Plaintiff applied for APP Vascular Surgery on May 29, 2022. (Doc. 24-6). Hiring manager Brea McLaughlin chose not to interview Plaintiff. (Doc. 24 at 81–82). APP Vascular Surgery sought either a Nurse Practitioner or a Physician Assistant for Vascular Surgery. (Doc. 25 at 11, citing Doc. 23-1 at 13). Fourteen people applied for the position, and McLaughlin ultimately chose Sarah Schockling to fill the role. (Doc. 23-1 at 13–14, 20). When she was hired, Schockling held a Physician's Assistant degree, was licensed as a Physician Assistant, and had experience performing a vascular surgery clinical rotation at Johns Hopkins Hospital and working as a neurosurgery Physician Assistant. (Doc. 24-39).

On September 13, 2022, Plaintiff submitted charges to the Ohio Civil Rights Commission, Charge No. COLE1(50192) 09132022, alleging that Defendant's failure to promote her to these positions was employment discrimination. (Doc. 1 at ¶ 32). The charges were dual-filed with the Equal Employment Opportunity Commission, EEOC Charge No. 22A-2023-00050. (*Id.*). In March 2023, Plaintiff requested and was granted a withdrawal of Charge No. COLE1(50192). (*Id.* at ¶ 33). Plaintiff initiated this lawsuit on April 21, 2023, and Defendants subsequently filed the instant Motion for Summary Judgment. (Docs. 1, 25). The Motion has been briefed and is ripe for review. (Docs. 29, 30).

Also, Plaintiff has filed a Motion for Leave to File a Sur-Reply in Opposition to Defendant's Motion for Summary Judgment (Doc. 31). "Although Plaintiff has no automatic right to file sur-reply, additional memoranda are sometimes considered. Local Civil Rule 7.2(a) states that only supporting, opposing, and reply memoranda can be filed, 'except upon leave of court for good cause shown.'" *NCMIC Ins. Co. v. Smith*, 375 F. Supp. 3d 831, 835 (S.D. Ohio 2019) (citation omitted); *see* S.D. Ohio Local Rule 7.2(a)(2). "Although Rule 7.2(a) does not define what constitutes good cause for filing any additional memoranda, such as a surreply, this Court has consistently held that in order for a party to be given permission to file a sur-reply, the reply brief must raise new grounds that were not presented as part of the movant's initial motion." *Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, No. 207-CV-1190, 2010 WL 4117552, at *4 (S.D. Ohio Oct. 19, 2010). "Good cause for a sur-reply also exists where a party seeks to 'clarify misstatements' contained in the reply brief." *NCMIC Ins. Co.*, 375 F. Supp. 3d at 836 (citation omitted).

Plaintiff argues that she has good cause for more briefing because Defendant raised a new argument in its reply brief. (Doc. 31). Specifically, this allegedly new argument concerns the relevant labor market used in an expert report Plaintiff offered in her response. (*Id.*). But the Court finds that the issue was raised in a parenthetical citation in Defendant's Motion for Summary Judgment. (*See* Doc. 25 at 21 (citing to a Sixth Circuit case and noting it held the proper comparator for the sake of statistical evidence is the qualified population in the relevant labor market)). So Plaintiff had notice that Defendant might raise the issue of the relevant labor market if she presented statistical evidence in her response. And notably, Plaintiff had notice of the case law that Defendant would (and did) use. (*See* Doc. 30 at 4, 13). Additionally, Plaintiff also says good cause exists because a sur-reply would seek to clarify a "significant misrepresentation" in

Defendant's reply brief. (Doc. 31). Plaintiff claims the terms Defendant used to describe the experience of one of the successful job candidates amounts to a misrepresentation. (*Id.*). For their part, Defendant says the contested term usage does not constitute a factual misrepresentation. (Doc. 33). The Court agrees with Defendant, and no additional briefing is needed. Thus, the Court **DENIES** Plaintiff's Motion (Doc. 31).

## II.    STANDARD

Summary judgment is granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When a defendant shows there is insufficient evidence to support any element of the plaintiff's claim and moves for summary judgment, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on which a reasonable jury could return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Evidence is viewed in the light most favorable to the nonmoving party, meaning that "any direct evidence offered by the [nonmovant] in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (citing *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. 2505, and *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). Ultimately, the Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. 2505.

6

## III.    DISCUSSION

Plaintiff alleges that Defendant discriminated against her on the basis of her race in violation of Title VII of the Civil Rights Act of 1964.  (Doc. 1 at ¶¶ 36–44).  Often, there is no direct evidence of discrimination when discrimination is alleged.  *See Hall v. Michigan State Police Dep't*, 290 F. App'x 913, 916 (6th Cir. 2008) ("Direct evidence is proof that, if believed, compels the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.").  That is true here.  So, in the absence of direct evidence, Plaintiff's employment discrimination claim is analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Boutros v. Canton Reg. Transit Auth.*, 997 F.2d 198, 202–03 (6th Cir. 1993) (applying the *McDonnell Douglas* framework to a claim under Title VII); *Abrams v. Johnson*, 534 F.2d 1226, 1230–31 (6th Cir. 1976) (adapting the *McDonnell Douglas* framework to a failure to promote claim).

Under *McDonnell Douglas*, Plaintiff bears the burden of establishing a threshold case of discrimination. 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  If successful, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its decision.  *Id.*  If Defendant does so, Plaintiff must show that the stated reason is pretextual cover for discrimination. *Id.* at 803–07, 93 S.Ct. 1817.

### A.    *Prima Facie* Case

To establish a claim of race discrimination under Title VII for a failure to promote, Plaintiff must show that (1) she is a member of a protected class; (2) she applied for and was qualified for a promotion; (3) she was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006) (citing *Sutherland v.*

*Michigan Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003)); *see also Russell v. Drabik*, 24 F. App'x 408, 412 (6th Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817).

The first three prongs are undisputed. The parties agree that Plaintiff is a member of a protected class, she applied for and met the minimum qualifications for the promotions at issue, and she was not promoted. (Doc. 25 at 14). But Defendant argues that Plaintiff cannot establish the fourth prong of the test because her qualifications are inferior to the successful candidates' resumés. (*Id.*).

To establish the fourth prong of the *prima facie* case a plaintiff must show that she and the successful candidate "had similar qualifications." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 242 (6th Cir. 2005). But "similarly situated does not mean identical; it means that the plaintiff was 'similar in all of the *relevant* aspects.'" *Braithwaite v. Dep't of Homeland Sec.*, 473 F. App'x 405, 410 (6th Cir. 2012) (emphasis in original) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). The inquiry focuses on objective qualifications. *Campbell v. Univ. of Akron*, 211 F. App'x 333, 348–49 (6th Cir. 2006); *see White*, 429 F.3d at 243–44 (finding the plaintiff's qualifications were not similar to the successful candidate where the successful candidate had ten more years of experience, more relevant previous roles, and past supervisory positions); *Meyrose v. Vitas Hospice Servs.*, LLC, No. CV 19-91-DLB-CJS, 2021 WL 5139478, at *10 (E.D. Ky. Nov. 3, 2021) (finding that the fact two candidates were offered interviews for a position suggested at least a genuine issue of fact that the candidates had relatively similar qualifications, establishing the fourth prong), *aff'd*, No. 21-6124, 2022 WL 3046969 (6th Cir. Aug. 2, 2022); *Walls v. Johnson*, 229 F. Supp. 3d 678, 686 (E.D. Tenn. 2017) (finding the fact that two candidates met the position's minimum qualifications after each application was scored

using a selection matrix was sufficient circumstantial evidence suggesting they possessed similar qualifications, establishing the fourth prong).

Establishing the *prima facie* burden is "not intended to be onerous." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814 (6th Cir. 2011); *see also Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981) ("The burden of establishing a prima facie case of disparate treatment is not onerous.").  Instead, the fourth prong functions as a mechanism "to eliminate the most common nondiscriminatory reasons for the employer's actions." *Provenzano*, 663 F.3d at 813.  The Court engages only in "a general weighing of" the two candidates' qualifications.  *Id.* at 813–14.  A "more searching evaluation of the relative qualifications of the two candidates" is more appropriately performed at the pretext stage of analysis.  *Id.* at 816.  Thus, an argument that Plaintiff cannot establish this burden because the selected candidate was superior "cannot be considered at [the *prima facie* case stage]." *Wheeler v. Miami Valley Career Tech. Ctr.*, No. 3:20-CV-141, 2022 WL 770162, at *7 (S.D. Ohio Mar. 14, 2022) (finding the fourth prong established where plaintiff possessed two degrees in the relevant field, had relevant experience and specialized training, and was interviewed because she met minimum qualifications), *aff'd sub nom. Wheeler v. Miami Valley Career Tech. Ctr.*, No. 22-3315, 2023 WL 142266 (6th Cir. Jan. 10, 2023).  The Court applies this analysis to both positions.

### i.    APP Ross Heart

In relevant part, the job posting for APP Ross Heart stated:

The Advanced Practice Provider is responsible for providing health care services to medical Cardiac patients. Enhances and expands the patient care within the medical practice. Collaborates with a physician (s) & other clinicians in providing a full scope of patient care. Focus is on preventive health or the management of acute or stable chronic conditions. Performs medical services within the confines of the Standard Care Arrangement, State of Ohio, OSUWMC Medical By Laws, and organizational policies.

9

Duties and Responsibilities
Teamwork/Team Leadership, Customer Focus, Staff Development/Job Knowledge and Resource Management should be interwoven throughout the employee's position description.

**Additional Job Description**
Nurse Practitioner or Physician Assistant. Rotating shifts.

(Doc. 25-1 at 5).

Defendant argues that Plaintiff cannot establish the fourth prong of her *prima facie* case because Wade, the successful candidate, was better qualified. (Doc. 25 at 14; 30 at 11). Defendant asserts that Farah selected Wade over the other candidates because he had "extensive experience working on a LVAD unit" and because "he was 'fresh out of school' and his skills were sharp." (Doc. 25 at 14, citing Doc. 19 at 19 and 19-1 at 3). But Defendant asks the Court to do too much at this stage of the analysis. As previously explained, Plaintiff and the successful candidate do not need to be doppelgängers. They just need to be similar enough. Plaintiff and Wade both held specialized certifications: Plaintiff as a Family Nurse Practitioner and Wade as a Primary Care Nurse Practitioner. (Doc. 24-30; Doc. 24-35). Both held master's degrees in nursing. (*Id.*). And both had experience working as staff nurses on floors caring for post-cardiac surgery patients. (*Id.*). More still, Plaintiff was qualified enough to get an interview, and two of the interviewers recommended that she proceed at least to the next round. (Doc. 20-1 at 9). Taken together, this is enough to suggest a genuine issue of fact that Plaintiff and Wade had similar qualifications. Plaintiff has met the *prima facie* burden for APP Ross Heart.

      **ii.**    **APP Vascular Surgery**

The job posting for APP Vascular Surgery was more extensive. In relevant part, it stated:

10

Scope of Position/Position Summary:
The Physician Assistant is responsible for providing health care services to vascular surgery patients. Enhances and expands the patient care within the medical practice. Collaborates with a physician (s) & other clinicians in providing a full scope of patient care. Focus is on preventive health or the management of acute or stable chronic conditions. Supervised by a practicing licensed physician. Performs medical services that have been specifically authorized & directed by the supervising physician.

Duties and Responsibilities
Teamwork/Team Leadership, Customer Focus, Staff Development/Job Knowledge and Resource Management should be interwoven throughout the employee's position description. Throughout each employee position description, competency, as it identifies the role and responsibilities of an employee, should be identified to assess, maintain, and improve competency.

\*\*\*
Minimum Qualifications:
For Hire: Master's degree in Physician Assistant Studies, Licensed and Certified to practice in State of Ohio; Experience in Cardiovascular care required.

(Doc. 25-1 at 8–11).

Defendant argues that Plaintiff was not similarly qualified as Schockling for this position because, unlike Schockling, she did not meet the preferred qualifications for the position. (Doc. 25 at 11–12). Specifically, Defendant notes that Schockling had work experience as an APP and was licensed as a Physician Assistant. (*Id.*). And Defendant says that Plaintiff's experience as a staff nurse was not relevant for this position. (*Id.*). Again, this is an assessment better suited for the pretext stage of the Court's analysis. *See Plegue v. Clear Channel Broad., Inc.*, No. 04-CV-74348-DT, 2005 WL 3133508, at \*9 (E.D. Mich. Nov. 22, 2005*)* ("Because a plaintiff has no obligation to prove relative qualifications to a jury, it can hardly be disputed that a plaintiff cannot be *required* to offer evidence that he is at least as qualified as the successful candidate in order to establish a prima facie case under *McDonnell Douglas*."). Even though Plaintiff's and Schockling's qualifications are not identical, Plaintiff possessed the minimum job qualifications and additionally had ten years of experience caring for cardiovascular patients. (Doc. 24-35);

11

*cf. Braithwaite*, 473 F. App'x 405, 411 (finding a candidate with an "extensive background in law enforcement and significant experience working in airports" sufficiently similar to a candidate who "worked in TSA's Transportation Security Operations Center" for a deputy federal security director position); *Walls*, 229 F. Supp. 3d at 686. Because the *prima facie* case is not meant to be onerous, Plaintiff's qualifications are enough to suggest a genuine issue of fact that Plaintiff and Schockling had similar qualifications. Plaintiff has met the *prima facie* burden for APP Vascular Surgery.

### B.    Legitimate, Nondiscriminatory Reason

"Under the *McDonnell Douglas* framework, if the plaintiff can establish her *prima facie* case, the defendant then has the opportunity to articulate a legitimate, non-discriminatory reason for the adverse action against the plaintiff." *Russell*, 24 F. App'x at 412 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–09, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). At this stage, Defendant does not need to persuade the Court that its candidate selection "was actually motivated by the proffered reasons," only that a genuine issue of fact exists as to whether it discriminated against Plaintiff. *Provenzano*, 663 F.3d at 814–15 (citing *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094). To do so, Defendant must "clearly set forth, through the introduction of admissible evidence, the reasons for not promoting" Plaintiff. *Id.* at 815 (citing *Burdine*, 450 U.S. at 255, 101 S.Ct. 1095). In other words, "the employer's burden is satisfied if he simply 'explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons.'" *Burdine*, 450 U.S. at 256, 101 S.Ct. 1095 (citation omitted). The Court finds that Defendant has checked this box for each position.

### i. APP Ross Heart

Defendant provides two reasons why Wade was selected over Plaintiff. First, Farah testified that Wade was better qualified than Plaintiff—he had four years of experience working on a floor that cared for patients after heart surgery that used LVAD pumps. (Doc. 25 at 9, 14, citing Doc. 19 at 16–17 and 19-1 at 3). This experience was, Farah said, "critical because [Wade] would be joining a team that managed the LVAD pumps." (Doc. 19-1 at 3, ¶ 14). In contrast, 5 Ross, where Plaintiff was a staff nurse, did not serve patients with LVAD pumps. (Doc. 19 at 26).

Second, Farah testified that Wade was the preferred candidate because he was a recent graduate, which Farah valued because Wade's relevant skills were sharper from his clinical rotations. (Doc. 25 at 10, 14, citing Doc. 19 at 20; *see* Doc. 24-30 (Wade's resumé)). On the other hand, Plaintiff received her certification and completed her clinical rotations years earlier and had not worked in an APP position since. (Doc. 24-35 at 3). Farah opined that someone, like Plaintiff, who went this long without practicing the skills relevant to APP Ross Heart would not be able to perform on the same level as someone, like Wade, with more recent experience. (*See* Doc. 19 at 20 ("If you go five years without practicing as an advanced practice provider, you're going to be rusty . . .")). At base, Defendant says that Wade's experience better fit the job requirements, and Wade would be ready for the job on day one.

Neither of the proffered reasons is discriminatory. *See Provenzano*, 663 F.3d at 815 (finding that a defendant properly met its burden of production when it produced evidence supporting that it "decided to promote a more qualified candidate"). Accordingly, a reasonable jury could find that Defendant had at least one legitimate reason for not selecting Plaintiff.

13

### ii. APP Vascular Surgery

The same is true for APP Vascular Surgery. Defendant provides multiple reasons why Schockling was hired over Plaintiff. First, McLaughlin testified that Schockling was better qualified. Her experience met the preferred qualifications of the position; namely, Schockling had two and a half years of APP experience, a clinical rotation in vascular surgery at Johns Hopkins Hospital, and had served as a Physician's Assistant. (Doc. 25 at 17, 18, citing Doc. 23 at 15–16 and 23-1 at 19; *see* Doc. 24-39 (Schockling's resumé)). According to McLaughlin, Schockling's experience best fit what was needed for the APP Vascular Surgery position. (*Compare id.*, citing Doc. 23-1 at 13–14, *with* Doc. 24-35 (Plaintiff's resumé). Defendant also claims that McLaughlin had previously witnessed Plaintiff engage in "unprofessional behavior" that she considered inconsistent with the teamwork-related job expectation outlined in the job posting. (Doc. 25 at 12, 18, citing Doc. 23 at 17–18 and Doc. 23-1 at 14). Neither of Defendant's proffered reasons is discriminatory. *See Provenzano*, 663 F.3d at 815. Accordingly, a reasonable jury could find that Defendant had at least one legitimate reason for not selecting Plaintiff.

### C. Pretext

"In the third and final stage of the *McDonnell Douglas* analysis, the presumption of discrimination is gone and the plaintiff must demonstrate that the employer's proffered nondiscriminatory reason was not the true reason for the employment decision, but rather a pretext for discrimination." *Provenzano*, 663 F.3d at 815 (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. 1095). "A plaintiff normally establishes pretext by showing that the proffered reason: (1) 'had no basis in fact,' (2) 'did not actually motivate the employer's action,' or (3) was 'insufficient to motivate the employer's action.'" *Stokes v. Detroit Pub. Sch.*, 807 F. App'x 493, 500 (6th Cir. 2020) (citation omitted). Concerning the second category, a "plaintiff can 'indict the credibility

of [her] employer's explanation' and establish pretext by offering circumstantial evidence showing that it is 'more likely than not' that the illegal motivation was the real motivation." *Braithwaite*, 473 F. App'x at 411 (citation omitted); *see also Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 342–43 (6th Cir. 1997) (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. 1095) ("Pretext is established by a direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible."). And "a plaintiff need not follow [the three] categories rigidly. . . Plaintiffs remain free to try to show pretext in whatever way they see fit." *Stokes*, 807 F. App'x at 500. In the end, "a plaintiff's *prima facie case*, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 509 (6th Cir. 2021) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

Plaintiff provides a plethora of overlapping arguments, supported by circumstantial evidence, for why Defendant's hiring explanations are pretextual. Ultimately, the Court concludes that the weight of the circumstantial evidence is not enough to establish a genuine issue of material fact.

### i.     Hiring Motivation

Plaintiff first attempts to establish pretext by arguing that Defendant's proffered reasons for hiring Wade and Schockling were not what actually motivated the hiring decision. (Doc. 29 at 34).

#### a.     APP Ross Heart

Plaintiff says that Wade could not have been selected for APP Ross Heart because of his LVAD experience when the job posting did not mention LVADs, Farah's notes of the candidate

interviews did not mention LVADs, and Plaintiff was not asked about LVAD experience during her interview. (*Id.*). Plaintiff also says that Farah was never instructed to prefer candidates who were recent graduates. (*Id.*). For support, Plaintiff notes that McLaughlin testified that, at an unspecified point in time, she was instructed by email (not as part of an official policy) that she "had to clear all new graduate APPs with our directors before offering hires." (*See* Doc. 23 at 45). But there is no evidence that Farah was given the same instruction for APP Ross Heart, nor does McLaughlin's testimony indicate that hiring managers were forbidden to hire new APPs or recent graduates.

The Sixth Circuit has held that "employers are not rigidly bound by the language in a job description." *Browning v. Dep't of Army*, 436 F.3d 692, 696 (6th Cir. 2006) (citing *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir. 1987)). Indeed, "an employer may give greater weight to some qualifications than others and may look to qualifications that are not expressly articulated in the job description." *McDaniels v. Plymouth-Canton Cmty*. Sch., 755 F. App'x 461, 470 (6th Cir. 2018). "So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates." *Wrenn*, 808 F.2d at 502.

While LVAD experience and recent graduate status were not listed on the job posting for APP Ross Heart, precedent does not preclude Farah from weighing them strongly. *See id.* ("Title VII does not diminish lawful traditional management prerogatives in choosing among qualified candidates."). Farah's preference for extensive LVAD experience makes sense in light of the successful candidate's responsibilities. (*See* Doc. 19 at 16–17). And Farah's preference for recent graduates is logical given that clinical rotations teach functional "muscle memory" that fades away without frequent use. (*See* Doc. 19 at 20). Still more, Plaintiff has failed to show that Farah's motivation in heavily weighing these factors was to unlawfully discriminate against Plaintiff on

16

the basis of race. *See Browning*, 436 F.3d at 697. The Court does not consider Farah's actions as sufficient to support an inference of pretext.

Plaintiff also argues that Defendant's rationale for hiring Wade has shifted over time. (Doc. 29 at 35–36; *see* Doc. 19-1 at 3). The Court disagrees. Consistently, Defendant has cited Wade's LVAD experience as a reason he was hired. (*See, e.g.*, Doc. 19 at 16–19; Doc 19-1 at 3; Doc. 20 at 35; Doc. 25-1 at 2). And Defendant has added Farah's preference for recent graduates and Wade's relevant experience as additional reasons for why Wade was an attractive candidate. (*See, e.g.*, Doc. 19 at 19, 30; Doc. 20 at 35). Defendants' additional reasons are permissible. S*ee Macdonald-Bass v. J.E. Johnson Constr.*, 493 F. App'x 718, 726 (6th Cir. 2012) ("[B]oth this Circuit and others have recognized that providing *additional* non-discriminatory reasons that do not conflict with the one stated at time of discharge does not constitute shifting justifications.") (collecting cases); *see also Alexander v. Ohio State Univ. College of Soc. Work*, 429 F. App'x 481, 489–90 (6th Cir. 2011). Thus, Defendant has not shifted its rationale for hiring Wade. *Cf. Fuller v. Michigan Dep't of Transp.*, 580 F. App'x 416, 426 (6th Cir. 2014) (finding a shifting rationale relevant to pretext when a provided rationale categorically opposed previous testimony).

### b. *APP Vascular Surgery*

Plaintiff similarly attempts to establish pretext for APP Vascular Surgery by arguing that the job posting did not prefer an Acute Care Nurse Practitioner or a Physician Assistant. (Doc. 29 at 21). But for the same reasons as above, McLaughlin was permitted to consider these qualifications in her hiring decision. *See McDaniels*, 755 F. App'x at 470; *Wrenn*, 808 F.2d at 502. And McLaughlin's rationale is logical because the job title is "Physician Assistant," and because experience as either a Physician Assistant or a Nurse Practitioner was the "main comparable factor" relevant to the functions of the position. (*See* Doc. 23-1 at 13–14). Defendant

was not required, as Plaintiff implies, to specify that nursing experience was not a proper substitute for this qualification.  (Doc. 29 at 21).  Still more, Plaintiff has failed to show McLaughlin's motivation in heavily weighing these factors was to unlawfully discriminate against Plaintiff on the basis of race.  *See Browning*, 436 F.3d at 697.  Consequently, the Court does not consider this sufficient evidence to support pretext.  *See id.* at 696.

ii.      **Guideline Deviations**

Plaintiff next suggests various hiring anomalies are evidence of pretext.  Defendant's administrative scheme relevant to this argument is The Ohio State University Wexner Medical Center's Recruitment, Selection, and Hiring Guidelines ("Guidelines").  (Doc. 22-1 at 9–10; *see also* Doc. 22-1 at 1–8 (The Ohio State University's Affirmative Action & Equal Employment Opportunity policy ("AA/EEO Policy"))).  The Guidelines state that they are "designed to guide managers toward developing a workforce representative of our community."  (Doc. 22-1 at 9). The Guidelines advise that interviewers can maintain consistent and equal interviews by "[d]iversify[ing] interview panel[s] to avoid groupthink and challenge implicit associations."  (*Id.* at 10).  They further advise that interviewers can develop consistent and equal evaluation criteria by "apply[ing] evaluation criteria consistently to all candidates."  (*Id.*).  At the outset, the Court notes that seemingly on their face, these provisions are not compulsory.  The only relevant provision that uses language suggesting it is more than mere guidance is the instruction that "[a]nyone participating in the interview, selection, and/or hiring processes *must* complete the Affirmative Action and EEO Recruitment and Selection Basics training."  (*Id.* at 9 (emphasis added); *see also* Doc. 22-1 at 1–8 ("[E]mployees who participate in hiring and selection processes must take Affirmative Action/EEO training as directed by the University.")).

18

It is true that an employer's failure to follow a hiring or selection policy can suggest pretext. For example, in *Love v. TVA Bd. of Directors*, the court considered an expert report that an employer failed to follow four of its own selection policies.  No. 3:06-00754, 2008 WL 906115, at *4 (M.D. Tenn. Mar. 31, 2008).  Notably, the expert opined that the employer "failed to follow its diversity or affirmative action plans in the selection at issue" by not educating the selecting manager on its affirmative action plan. *Id.* at *5.  The court observed that "an employer's deviation from its own policies can, in some instances, provide evidence of pretext," along with other factors supporting pretext. *Id.* at *17 (citing *Russell v. TG Missouri Corp.*, 340 F.3d 735, 746 (8th Cir. 2003)).  Thus, the expert's opinions about the employer's failure to follow its policies were "relevant to the question of pretext." *Id.*

But there is another hurdle a plaintiff must overcome beyond simply alleging an employer failed to follow a policy.  To be a foundation for a showing of pretext, the relevant policy must be "sufficiently established." *See White*, 429 F.3d at 246 (disregarding as insufficiently established arguments that an employer violated a nepotism policy and a policy preferring internal, equally qualified candidates support a finding of pretext).  And a plaintiff does not overcome this hurdle if the defendant takes action contemplated within the policy or guidelines. *See Tracy v. Northrop Grumman Sys. Corp.*, No. 10-3930, 2011 WL 6965839, at *2 (6th Cir. Dec. 21, 2011) (holding plaintiff did not carry her burden of persuasion as to pretext, in part, because "[s]he did not demonstrate that defendant failed to follow its procedures . . . the evidence showed [defendant] took action that was considered by the rules it promulgated."); *cf. Love*, 2008 WL 906115, at *5 (expert testimony that an employer violated their own, established affirmative action plan and selection policies).  In other words, the action taken must contravene an employer's established protocol.

19

Plaintiff alleges that various guideline deviations by both Farah and McLaughlin demonstrate that Defendant's legitimate, nondiscriminatory reasons for not selecting Plaintiff are pretextual. (Doc. 29 at 31).

### a. Interview Grids

Plaintiff attempts to establish pretext by arguing that neither Farah's team nor McLaughlin used OSU's pre-established interview grids for their respective interviews. (Doc. 29 at 13; *see* Doc. 21 at 35–38 (deposition of APP manager Sheila Mapes discussing interview grids); Doc. 21-1 at 7–8 ("Advanced Practice Provider Targeted Selection Interview Rating Grid")). But use of this interview grid is not mentioned in the Guidelines or Defendant's AA/EEO Policy. (Doc. 21-1 at 9–10; *see* Doc. 22-1 at 1–8). And Plaintiff does not submit evidence that use of the interview grid was more than "strongly suggested" by the human resources department. (*See* Doc. 21 at 35–36 ("Q: So did human resources state that these interview rating grids were required to be used for APP positions posted within the last two years? A: They were strongly suggested.")). In fact, the record suggests that failure to complete an interview grid would not be a violation of Defendant's policies. (*Id.* at 36–37 ("Q: If an APP was interviewed . . . and there was no [interview grid] completed, would the employee . . . be disregarding Wexner Medical Center policies? A: No. As I said, it was strongly suggested.")). Simply put, Farah's team and McLaughlin were free to use other interview mechanisms. Therefore, Plaintiff has not sufficiently established that the nonuse of interview grids creates a genuine issue of material fact as to pretext, because there was no policy violation. *See White*, 429 F.3d at 246; *Tracy*, 2011 WL 6965839, at *2.

### b. Subjective Criteria

Plaintiff further asserts that Farah deviated from the Guidelines that advise interviewers to "[a]pply evaluation criteria consistently to all candidates." (Doc. 29 at 32; *see* Doc. 21-1 at 10).

20

More specifically, Plaintiff says that Farah did not record feedback from all of his interviewers. (Doc. 29 at 32). Additionally, some candidates moved on to the second-round interviews with three "yes" votes whereas others did not. (*Id.*). But Farah testified that he asked everyone on his team their opinion of Plaintiff, even though he did not include all of the feedback in his notes. (Doc. 20 at 35–36). Regardless, Plaintiff does not make clear how this indicates a failure on Farah's part to apply evaluation criteria consistently, especially considering Farah's notes documented considerations other than simply how many "yes" votes a candidate received. (*See* Doc. 20-1 at 9). Accordingly, the Court concludes that this alleged guideline deviation is not enough to create a genuine issue of material fact as to pretext.

### c. *Interview Diversity and AA/EEO Training*

Finally, Plaintiff argues that the hiring process for APP Ross Heart contravened two more of the Guidelines. (Doc. 29 at 32). Plaintiff says Farah's interview panel was not racially diverse, and the interviewers did not complete the required AA/EEO recruitment and selection basics training. (*Id.*; *see* Doc. 22-1 at 9–10). The Court observes that it seems that Farah and his team did not follow these provisions to the letter. For instance, while the general hiring team had some racial diversity (as Farah himself does not identify as Caucasian), there were no self-identified African American interviewers on the interview panel itself. (Doc. 20 at 12–14; *see* Doc. 19-1 at 3). And Farah testified that he was unsure if the interviewers completed the required training prior to the interview, as he did not check beforehand. (Doc. 20 at 16–17). But to be clear, neither party has put forth evidence whether the interviewers completed this training before Plaintiff's interview. That fact is unknown.

More still, even if the Guidelines were not followed, it is not enough for Plaintiff here. As the Sixth Circuit instructs, "an employer's failure to follow its own policies will be insufficient *by*

*itself* to establish pretext." *Marshall v. Belmont Cnty. Bd. of Comm'rs*, 110 F. Supp. 3d 780, 791 (S.D. Ohio 2015), *aff'd*, 634 F. App'x 574 (6th Cir. 2016); *see also White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005) (citing *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180 (D.C. Cir. 1996)) ("[A]n employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext."). The failure has probative value only "when considered in combination with other evidence of pretext . . . ." *Marshall*, 110 F. Supp. 3d at 791. Even in *Love*, the district court did not consider policy deviations persuasive in isolation; rather, it found a combination of factors established a genuine issue of material fact as to pretext. 2008 WL 906115, at \*16–18 (also considering the employer's subjective criteria in hiring; Plaintiff's qualifications, job experience, and performance; departures from human resources standards; and statistical evidence); *cf. Stokes*, 807 F. App'x at 501 (finding that an interviewer did not sign off on interview guidelines, among other interview process irregularities, did not constitute pretext sufficient to overcome summary judgment without more).

Those other factors are not present here. As the Court continues to explain, Plaintiff has not presented other evidence which can, in combination with these guideline deviations, raise a genuine issue of material fact as to pretext. Consequently, Defendant's failure to follow its own guidelines, by itself, does not show Defendant's proffered reason for promoting Wade instead of Plaintiff was pretext for discrimination.

### iii.    Preselection

Plaintiff further argues that McLaughlin preselected Schockling for APP Vascular Surgery because she worked with Schockling's fiancé. (Doc. 29 at 37). Under certain circumstances, preselection of a candidate can constitute a hiring irregularity, which, in turn, can refute a defendant's proffered legitimate, nondiscriminatory reasons. *Fijalkowski v. Belmont Cnty. Bd. of*

22

*Commissioners*, No. 2:17-CV-0195, 2021 WL 1964478, at *7 (S.D. Ohio May 17, 2021) (citing *Stokes*, 807 F. App'x at 503). But the only piece of evidence Plaintiff cites in support of this theory is her own affidavit stating that McLaughlin worked with Schockling's fiancé. (*See* Doc. 27). And "[s]elf-serving affidavits, alone, are not enough to create an issue of fact sufficient to survive summary judgment." *Johnson v. Washington Cty. Career Ctr.*, 982 F. Supp.2d 779, 788 (S.D. Ohio Nov. 12, 2013) (citing *Wolfe v. Vill. of Brice, Ohio*, 37 F.Supp.2d 1021, 1026 (S.D. Ohio 1999); *cf. Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584-85 (6th Cir. 1992) ("Even if the Court were to consider the Affidavit, the statements contained therein are nothing more than rumors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim of discrimination as a matter of law." (citations omitted)). Plaintiff's hunch, without more, fails to support to an inference of pretext. *Cf. George v. Youngstown State Univ.*, 966 F.3d 446, 465 (6th Cir. 2020) ("George claims that Goldthwait and possibly another faculty member told him that Seitz had been preselected for the job, allowing for an inference of pretext.").

### iv. Subjective Evaluation

Plaintiff next contends that both Farah and McLaughlin utilized subjective evaluation criteria, evidencing pretext. (Doc 29 at 33). "Subjective evaluation processes intended to recognize merit provide ready mechanisms for discrimination . . . . Subjective employment evaluations, however, are not illegal per se. The ultimate issue in each case is whether the subjective criteria were used to disguise discriminatory action." *Grano v. Dep't of Dev. of City of Columbus*, 699 F.2d 836, 837 (6th Cir. 1983) (citations omitted). An "employment decision is subject to 'particularly close scrutiny' when it was subjective and decision makers were not members of minority group." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) (citing *Bruhwiler v. University of Tennessee*, 859 F.2d 419, 421 (6th Cir. 1988)), *opinion*

23

*amended on denial of reh'g*, 97 F.3d 833 (6th Cir. 1996). But "proof of the use of subjective criteria does not, alone, establish a Title VII claim." *Love*, 2008 WL 906115, at *16 (citing *Browning*, 436 F.3d at 697).

### a.     APP Ross Heart

Plaintiff says that Farah's interview spreadsheet notes about personal qualities, like in Plaintiff's case that she was "timid," is a subjective evaluation. (Doc. 29 at 34; *see* Doc. 20-1 at 9). But Plaintiff fails to make clear how this subjective criterion was used to disguise Defendant's discriminatory action. *See Grano*, 699 F.2d at 837. It is not the Court's place to question how Farah considered qualities such as "teamwork" and "customer focus" as relating to job functions, either in the job posting or otherwise. (Doc. 25-1 at 5); *see Browning*, 436 F.3d at 698 ("Questioning the Army's hiring criteria is not within the province of this court, even if the Army's hiring process was entirely subjective."); *Aday v. Westfield Ins. Co.*, No. 21-3115, 2022 WL 203327, at *5 (6th Cir. Jan. 24, 2022). More still, Farah did not rely on subjective criterion alone in making the hiring decision. To the contrary, Defendant's proffered reasons for its hiring decision—Wade's LVAD experience and recent graduate status—are objective. As such, these notations do not sufficiently establish an inference of pretext.

### b.     APP Vascular Surgery

In the same way, Plaintiff says that McLaughlin used subjective hiring criteria because she testified that one of the reasons that Schockling was hired was because "her interpersonal skills during her interview were excellent." (Doc. 29 at 33, citing Doc. 23 at 27). But, again, Plaintiff fails to make clear how this subjective criterion was used to disguise Defendant's discriminatory action. *See Grano*, 699 F.2d at 837. Defendant's proffered reasons for its hiring decision, Plaintiff's and Schockling's relative qualifications, is objective. This is not a case where Plaintiff's

24

and Schockling's interview performances were evaluated and compared as a primary factor for denying Plaintiff the promotion. Plaintiff was not selected for an interview based on her on-paper qualifications. *Cf. White v. Baxter Healthcare Corp.*, 533 F.3d 381, 394 (6th Cir. 2008) (noting that an evaluation of interview performance was an "inherently subjective determination, and thus easily susceptible to manipulation in order to mask the interviewer's true reasons for making the promotion decision," when the plaintiff was arguably superiorly qualified.). This comment, therefore, does not sufficiently establish an inference of pretext.

### v. Statistical Evidence

The Court lastly turns its attention to the statistical evidence Plaintiff has offered. (Doc. 29 at 28–29). While Plaintiff presents this argument as support for her *prima facie* case of discrimination, the in-circuit cases Plaintiff cites discuss statistical evidence during the pretext analysis. *See Thompson v. Fresh Prod.*, LLC, 985 F.3d 509, 527 (6th Cir. 2021)("[T]he statistics Thompson offers cannot overcome the most obvious explanations for the layoffs . . . ."); *Reid v. Michigan Dep't of Corr.*, 101 F. App'x 116, 121 (6th Cir. 2004) (considering statistical evidence at the pretext stage of a failure to promote claim); *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 437–38 (6th Cir. 2002) ("[B]y presenting statistical evidence along with Slater's testimony, Hopson has raised a genuine issue with respect to whether DaimlerChrysler's proffered reasons for its employment decisions constitute pretext."); *Love*, 2008 WL 906115, at *18 (considering statistics at the pretext stage of a failure to promote claim); *but see Driggers v. City of Owensboro, Kentucky*, 110 F. App'x 499, 508 (6th Cir. 2004) (considering statistical evidence at the fourth prong of the *prima facie* case of a constructive discharge claim). Accordingly, the Court will consider this evidence as relevant to pretext.

25

Plaintiff purports that statistical evidence shows the difference between the expected number of African American APPs employed by Defendant and the actual number is "so large that to almost a certainty the University's observed pattern of APP hiring could not be due to random chance." (Doc. 29 at 12). By presenting "significant statistics . . . coupled with independent circumstantial evidence of discrimination," a plaintiff can raise a genuine issue of material fact with respect to whether an employer's proffered legitimate nondiscriminatory reasons for an adverse employment action constitute pretext. *Hopson*, 306 F.3d at 437–38.

Only two African American APPs were employed by Defendant between January 2019 and September 2022, and no more were hired during that time even though Defendant added 120 APP positions. (Doc. 29 at 9–11, citing Doc. 22-1 at 14 and Doc. 29-1 at 2–3). With 662 total APPs employed by OSU, this number equates to 0.302%. (*Id.*, citing Doc. 26-2 at 3). According to the Chief Diversity Officer and Associate Dean for Diversity and Inclusion at the OSU Wexner Medical Center, about 29% of the Columbus population and about 13% of the Ohio population are African American. (*See* Doc. 22 at 32). And the percentage of African American APPs in the U.S., as identified by the Bureau of Labor Statistics, was 12.79% in 2022. (Doc. 26-6 at 4–5, citing U.S. Bureau of Labor Statistics, *Percent of employed people 16 years and older in the 25 largest healthcare occupations by race, 2022*, https://www.bls.gov/spotlight/2023/healthcare-occupations-in-2022/home.htm (last visited Feb. 28, 2024)).

Plaintiff's expert, Dr. Harvey S. Rosen, performed a Chi-Square test comparing the expected number of African American APPs employed by OSU to the actual number employed by OSU, using the Bureau of Labor Statistics nationwide percentages as a comparator. (Doc. 26-2 at 5–6). The Chi-Square test found the number of African American APPs employed by OSU was expected to be 85 compared to the actual number of 2—a statistically significant difference.

(*Id.*). Dr. Rosen's report concluded that "[t]he difference is so large that to almost a certainty, the observed pattern . . . could not be due to random chance." (*Id.*).

But there are two reasons the Court does not find these statistics raise a genuine issue of material fact. First, Defendant does not require applicants or employees to disclose their race. (*See* Doc. 24 at 210; Doc. 29-1 at 2; Doc. 29-3 at 5). Race is disclosed on a voluntary basis only. (*Id.*). Because a person of any race may opt to not disclose their race to OSU, the statistics offered by Plaintiff about the relative number of African American APPs employed by Defendant may not hold true to reality.

Second, the Sixth Circuit has held that statistical evidence of discrimination is proper if it compares the protected group in question to the qualified population in the relevant labor market. In *Driggers v. City of Owensboro, Kentucky*, a terminated police officer offered statistical evidence that women comprised only 4% to 4.5% of the city's police department as compared to comprising one-half of the U.S. workforce in support of her sex discrimination allegations. 110 F. App'x at 509. But the Sixth Circuit concluded that the "statistic [was] not probative of sex discrimination . . . because it fail[ed] to compare the gender composition of the police force to the qualified population in the relevant labor market. *Id.* (citing *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977) ("The Court of Appeals was correct in the view that a proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market.")); *see also Hopkins v. Canton City Bd. of Educ.*, 477 F. App'x 349, 358 (6th Cir. 2012) ("[O]ne should compare the racial composition of the staff to the *relevant labor market* rather than to the student population. Hopkins provides no evidence of the racial composition of the pool of qualified administrator candidates in the Canton teaching market.").

27

So too here. Plaintiff's statistical evidence does not have significant probative value because it does not compare the number of African American APPs at OSU to the number of APPs in the relevant labor market. Plaintiff's Chi-Square test used qualified African American APPs nationwide as a comparator, not qualified African American APPs in the relevant labor market, namely the greater Columbus area. The population of African American people in either Columbus or Ohio are similarly inappropriate comparators. The Court cannot extrapolate how many qualified African American APPs are in the greater Columbus area based on these numbers alone.

It is undisputed that the percentage of APPs employed by Defendant who voluntarily identified as African American at the time Plaintiff applied to these positions was substantially less than 1%. But without an indication that this percentage is an accurate reflection of the actual number of African American APPs employed by Defendant or a proper relevant market comparator analysis, the Court cannot call this evidence "significant." And that, along with independent circumstantial evidence of discrimination, is what precedent requires at this stage. *Cf. Reid*, 101 F. App'x at 121–22 (citing *Hopson*, 306 F.3d at 438) ("We are satisfied that, whatever the actual number, it is clear that there were few African-American women employed at high levels at MDOC. Unfortunately . . . statistical evidence alone is not enough to substantiate her discrimination claim. In this case, the statistical evidence produced was obviously weak rather than 'significant,' and it was not 'coupled with independent circumstantial evidence of discrimination.'").

\*\*\*

In sum, when taking all of the evidence in the light most favorable to Plaintiff, the Court cannot conclude that Plaintiff has established a genuine issue of material fact that supports an

28

inference of pretext. Although Plaintiff offers some circumstantial evidence—minor deviations from policy and particular subjective elements of the hiring processes—it is not enough to raise a genuine issue of material fact. *See Marshall*, 110 F. Supp. 3d at 791; *Browning*, 436 F.3d at 697. The Court finds that no reasonable jury, on this evidence alone, would make a finding that Defendant's reasons for not hiring Plaintiff are pretextual. Consequently, Defendant is entitled to summary judgment on Plaintiff's race discrimination claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 25) is **GRANTED**. The Court further **DENIES** Plaintiff's Motion for Leave to File a Sur-Reply (Doc. 31). The Clerk is **DIRECTED** to enter judgment in favor of Defendant.


IT IS SO ORDERED.

Date:  March 7, 2024                          /s/ Kimberly A. Jolson
                                              KIMBERLY A. JOLSON
                                              UNITED STATES MAGISTRATE JUDGE